FILED
2017 Feb-14  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| LASHAUNETTA C MODLEY, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>31 W INSULATION COMPANY, )<br>)<br>Defendant. )<br>)<br>) | 7:15-cv-01221-LSC |

MEMORANDUM OF OPINION

Before the Court is Defendant 31 W Insulation Company's ("WIC") Motion for Summary Judgment (Doc. 51). Plaintiff, LaShaunetta C. Modley ("Modley") brought this action alleging employment discrimination under 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). However, Modley's claims under Title VII were voluntarily dismissed on March 29, 2016. Therefore, only Modley's claims under the ADA remain pending. For the reasons stated below, Defendant's motion is due to be granted.

I.   BACKGROUND

WIC is a company engaged in the business of "home improvement services." (Simpkins Dec. ¶ 3.) WIC maintained an office in Tuscaloosa,

Alabama, where Modley worked as a full-time secretary from January 2014 until her termination in May 2014. Modley and a Branch Manager were the only individuals who worked at the office regularly, and the Branch Manager was often away from the office visiting job sites. The Branch Manager reported to Regional Managers, Mark Edge ("Edge") and Johnny Simpkins ("Simpkins"), who typically worked in Tuscaloosa about once a week—mostly at job sites. (Dobbs Dec. ¶ 5.) While Modley worked for WIC, the Branch Manager in Tuscaloosa was first Mark Araujo ("Araujo")—until February 2014—and then Chris Dobbs ("Dobbs").

Modley has been diagnosed with bipolar depression, anxiety, and Post-Traumatic Stress Disorder ("PTSD") and takes medication for all those conditions. She also testified that she was diagnosed with ADHD as a child, but she never took medication for that condition. Modley testified that her mental illnesses cause her to have unstable moods, suicidal thoughts, feelings of worthlessness, loss of focus, episodes of irritability, lack of motivation, and struggles with understanding simple instructions. She also said that because of her illness, she needs to be alone sometimes, and that there are days when her health causes her to "move slowly." (Modley Dep. at 89-94.) The frequency of these symptoms appears to vary depending on circumstances in Modley's life. Due to her

disabilities, Modley has been receiving Social Security benefits since 2010. In its proceedings, the Social Security Administration determined that Modley can only work "20 something" hours a week. While she has tried to work, and has had a variety of jobs, she has been unable to keep any of them for longer than four months.

Modley was trained for her secretarial position in Atlanta over a five-day period. However, Modley testified that these days were not full work days, and that the training that she received was "poor," and too focused on filing instead of data entry. (Modley Dep. at 208.) At this training, she was given a binder with pictures and instructions on how to complete her tasks. Yet, Modley testified that the binder was "horrible" and the "the worst instructions [she] had ever seen." (Modley Dep. at 287.) Simpkins also personally provided training by standing behind her desk and showing her how to complete her work, but Modley claims that she found him intimidating and could not learn that way.

Among other duties, Modley was required to answer the phones, fill out new hire packets, file paperwork, and enter data into the company's software—including employee time cards, payroll, and billing. She admitted that she "had problems" and made repeated mistakes in filing out the new hire packets and probably "mess[ed] up" billing data because

she did not understand how the system worked. She also admitted that she sometimes entered the wrong time card information in the computer system, but claims that it was not her responsibility, but rather the manager's, to make sure that the time card information was entered accurately. Further, Modley was occasionally late in submitting payroll information, which delayed the company's ability to pay its employees. However, Modley testified that her lateness was sometimes due to computer problems or Dobbs's own lateness in submitting paperwork for her to enter. WIC also claims that Modley was confrontational and aggressive at work, and that she did not get along well with her co-workers. Indeed, when Dobbs asked her to forward his calls, Modley told him that it was his job to forward calls, and not hers.

On February 11, 2014, Modley showed Araujo a note that said "I . . . suffer with a disability that may cause clerical mistakes . . . during my employment."[1] (Modley Dep. at Ex. 16.) She claims that she also told Edge about her condition, and that she asked him for more training and to be more patient with her and understand that, because of her disability, she would repeatedly make the same clerical mistakes. She also claims that she told Simpkins that she had a disability and needed

---

[1] Modley also testified that she placed this note in her file. However, her testimony is inconsistent about whether the note remained in her file or was removed.

more training. Modley explained that the enhanced training she needed was someone "right there beside" her while she worked, so that her mistakes could be corrected instantly. Modley testified that while this "training" would not have to be permanent, it might be extensive. (Modley Dep. at 257.) Modley testified that with training she "eventually" would be able to do her work. (Modley Dep. at 228.) However, she admitted that she could not be sure that even with further training, she would not continue to make mistakes, because "that's part of my disability." (Modley Dep. at 228.)

WIC responded to these mistakes by sending Modley various emails in which she was advised to check her work more carefully and pay more attention before she submitted information. WIC claims that Modley was issued a written warning on March 18, 2014 for her failure to enter data correctly. Modley testified that she never received such a warning and that she believes it to be falsified. However, she admitted that WIC management often spoke to her about her errors and how to fix them. Modley was terminated on May 22, 2014, after she had multiple issues entering payroll information that morning. WIC asserts that Modley was fired for her multiple mistakes in entering data and her inappropriate work conduct.

However, Modley claims that the problems she was fired for were really caused by Dobbs and Edge, and that she was made a scapegoat for their mistakes. (Modley Dep. at 272-78.) She also claims that her mistakes were caused by her disability and its effect on her focus and ability to notice details. After she ended her employment at WIC, Modley wrote a fourteen-page letter to WIC's Human Resources, relating her version of events. (Modley Dep. at Ex. 20.) In it, she blamed Edge and Dobbs for many of the mistakes she made on May 22, 2014, and said that her dismissal was unfair and "discriminatory." (*Id.*) However, she did not mention her disability or a lack of reasonable accommodation in this letter. (*Id.*)

## II. STANDARD OF REVIEW

Modley, proceeding pro se, filed no response to WIC's motion for summary judgment. Nonetheless, this Court "consider[s] the merits of the motion" in order to determine whether summary judgment is appropriate. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101–02 (11th Cir. 2004).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is

"material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citations omitted). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

III. DISCUSSION

Modley claims that WIC discriminated against her for her disability by 1) terminating her and 2) not providing reasonable accommodations for her disability. In order to establish a prima face of disability discrimination under the ADA, Modley must show that "(1) [s]he is disabled, (2) [s]he is a qualified individual, and (3) [s]he was subjected to unlawful discrimination because of [her] disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).

Modley's alleged disability consists of bipolar disorder, PTSD, depression, and anxiety. The Eleventh Circuit has held that depression is a mental impairment. *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996), *amended* 102 F.3d 1118 (11th Cir. 1996). However, in order for Modley to show that she qualified as a disabled individual under the ADA, she must show that her impairment "substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) (quoting 45 C.F.R. § 84.3(j)(2)). Modley has provided evidence that her disability affected her

ability to learn and work. Therefore, she has established that she is disabled under the ADA.

However, Modley has failed to establish that she is a qualified individual. A qualified individual is "able to perform the essential functions of the employment that he holds or seeks with or without reasonable accommodation." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226 (11th Cir. 2005). Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). Modley has admitted that data-entry work was a large part of her job as a secretary at WIC. The data that Modley was entering, including payroll and billing, was essential to WIC's operation, and Modley understood that if it was not entered correctly and in a timely fashion, WIC's operations would be disrupted. Entering data correctly was therefore an essential function of Modley's job.

Modley testified that even if she was given the accommodations that she requested, she could not say that she would not continue to make clerical mistakes, because making mistakes is part of her disability. Further, Modley requested that someone be by her side while she worked to help her learn how to do her job properly. However, it is undisputed

that Simpkins stood behind Modley and tried to help her with her work, but Modley did not find it helpful, and continued to make mistakes.

Because Modley did not provide any evidence that she could perform data entry correctly, even with reasonable accommodation, she has not established that she is a qualified individual, and has not made out a prima facie case of disability discrimination.

IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is due to be GRANTED. A separate order consistent with this opinion will be entered.

**DONE** and **ORDERED** this 14th day of February 2017.

_____
L. Scott Coogler
United States District Judge

186291